UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PEOPLE OF THE STATE OF NEW YORK,
by Andrew M. Cuomo, Attorney General of
the State of New York,

      Petitioner,

v.                    7:09-CV-0268
                     (GTS/GJD)
M & E TECHNICAL SERVICES, LLC; and
MICHAEL DONNELLY, President and
Chief Officer of M & E Technical Services, LLC,

      Respondents.
_____

APPEARANCES:            OF COUNSEL:

HON. ANDREW M. CUOMO       DEANNA R. NELSON, ESQ.
Attorney General for State of New York   Assistant Attorney General
 Counsel for Petitioner
317 Washington Street
Watertown, NY 13601-3744

HANCOCK & ESTABROOK, LLP     JAMES P. YOUNGS, ESQ.
 Counsel for Respondents        JOHN G. POWERS, ESQ.
1500 AXA Tower I
100 Madison Street
Syracuse, NY 13221-4976

HON. GLENN T. SUDDABY, United States District Judge

## MEMORANDUM DECISION and ORDER

  Currently before the Court in this special proceeding, brought by the People of the State of New York ("Petitioner") through the Attorney General's Office against M & E Technical Services, LLC, and Michael Donnelly, president and chief officers thereof ("Respondents"), is Petitioner's motion to remand the action to state court. (Dkt. No. 6.) For the reasons that follow, Petitioner's motion is denied.

## I. BACKGROUND

### A. Relevant Procedural Background

On January 28, 2009, the New York State Attorney General filed, by way of an Order to Show Cause, a Verified Petition (the "Petition"), and supporting affidavits, in New York State Supreme Court, Jefferson County. (Dkt. No. 1, Part 2.) The Petition named two Respondents: (1) M & E Technical Services, LLC, a government contracting firm located in Austin, Texas; and (2) Michael Donnelly, the president and chief officer thereof. (*Id.*)

The Petition originated from complaints made by temporary workers at the Army base located at Fort Drum, New York ("Fort Drum"), who had been hired by Respondents to perform what is known as "Up Armor" tasking (which involved applying armor to military vehicles), and who were subsequently either laid off or terminated by Respondents. (Dkt. No. 1, Part 2, at ¶¶ 21, 27.) The Petition attaches 72 such complaints. (Dkt. No. 1, Parts 8-13.) Essentially, the Petition allege as follows: (1) Respondents promised them six months of employment, which they did not receive; (2) Respondents promised them health benefits, which they did not receive; (3) Respondents failed to pay some employees at a promised rate or for hours worked; and (4) Respondents failed to reimburse some employees for tools that were lost or damaged during the tasking. (Dkt. No. 1, Part 2, at ¶¶ 5-18.)

As a result, the Petition alleges that Respondents (1) systematically and fraudulently lured individuals into employment by falsely promising six months of employment and benefits, while knowing that they were under orders (sent September 12, 2008) to have all work completed on or before October 14, 2008, (2) failed to pay wages that they promised in the job solicitation, and in some instances failed to pay any wages at all, and (3) otherwise defrauded

employees. (*Id*. at ¶¶ 19-40.) More specifically, the Petition alleges that these actions constitute a pattern of "fraudulent, deceptive, and illegal," conduct in violation of New York Executive Law § 63(12),[1] New York General Business Law § 349, and New York Business Corporation Law § 1303. (*Id*.) The Petition seeks significant monetary and equitable relief, including an order that Respondents be prohibited from conducting business in the State of New York. (*Id*. at "Wherefore" Clause.)

On March 4, 2009, Respondents removed the action to this Court pursuant to 28 U.S.C. §§ 1441, 1442, and 1446. (Dkt. 1, Part 1.) On March 11, 2009, Respondents interposed a Verified Answer to the Petition and asserted a Counterclaim, in equity, against the New York State Attorney General's Office. (Dkt. No. 4.) On March 30, 2009, Petitioner replied to Respondents' counterclaim, and filed a motion to remand seeking an order remanding this proceeding back to New York State Supreme Court. (Dkt. Nos. 5, 6.) Petitioner argues that removal was not proper under either 28 U.S.C. § 1441, or 28 U.S.C. § 1442. (Dkt. No. 6.)

**B.      Relevant Factual Background**

In September of 2008, Respondents entered into a contract with Stanley Associates, Inc. ("Stanley"), a government general contractor, to perform work on United States Army military vehicles at Fort Drum. (Dkt. No. 1, Part 2, ¶ 7.) Specifically, on or about September 12, 2008, Stanley tasked Respondents with a four-week job on Fort Drum, applying armor to military

---

[1] Section 63 of the New York Executive Law vests the Attorney General for the State of New York with the responsibility for prosecuting all actions and proceedings in which the State is interested. N.Y. Exec. Law § 63 (McKinney 2006). Section 63(12) also specifically vests the Attorney General with authority to commence a proceeding in the Supreme Court, on five days notice, to enjoin any "repeated fraudulent or illegal acts" in the conduct of any business, and to seek restitution and damages on behalf of injured parties. N.Y. Exec. Law § 63(12) (McKinney 2006).

vehicles.  (Dkt. No. 1, Part 18, at 5-6.)  Respondents were to complete their job no later than October 14, 2008, per the orders.  (*Id*.)

As part of the contract, Respondents were to maintain operations in Kentucky, but have the capability to deploy maintenance teams to provide services on an urgent basis in remote locations.  (*Id*.)  As a result, according to Respondents, on September 18, 2008, they sent a Program Manager, Reginald Booker, to Fort Drum, along with approximately twenty (20) experienced laborers.  (Dkt. No. 9, at ¶¶ 1, 9.)  On September 19, 2008, Mr. Booker arrived at the Fort Drum maintenance site to take stock of the tasking.  (*Id*. at ¶ 9.)  Present at the site were other military contractors, as well as Department of Defense ("DOD") Quality Assurance Representative ("QAR") Henry Meadows, who informed Mr. Booker that "he (Mr. Meadows) was in charge of the operation," and that Mr. Booker needed "to hire approximately 140 workers to form crews to install armor on military vehicles."  (*Id*. at ¶¶ 5, 9.)  According to Mr. Booker, because he only had approximately twenty (20) laborers on the site, he needed to hire another 120 laborers from the local labor force.  (*Id*. at ¶ 9.)

According to Petitioner, in an effort to hire these workers, Respondents "launched an aggressive hiring effort in New York State."  (Dkt. No. 6.)  On September 22, 2008, and September 23, 2008, as part of Respondents' hiring efforts, Mr. Booker attended a job fair and represented to certain applicants (some of whom would become employees) that "the job was to install armor on vehicles and was supposed to last through March of 2009."  (Dkt. No. 9, at ¶¶ 11-13.)  In addition, all new hires filled out an employment application, which indicated that employment with Respondents was not for any fixed period of time, and which gave new hires the option of filling out a health benefits application.  (*Id*. at ¶¶ 16-18.)  The health benefits

application stated that "the benefits are subject to a waiting period of '30 Days.'" (*Id*. at ¶ 18.)

According to Respondents, "the representations made to laborer applicants regarding the length and nature of the tasking that are alleged to be fraudulent were founded upon information provided by the government's contracting representatives." (Dkt. No. 8; Dkt. No. 9, at ¶¶ 6-15.) More specifically, Mr. Booker states that the Government, through Henry Meadows, informed him that "the work was to consist of four waves of 'up armoring' vehicles, with the first wave to constitute 151-167 vehicles, to be followed by successive waves of vehicles requiring pre-deployment up armoring." (Dkt. No. 9, at ¶¶ 7-8.) According to Mr. Booker, "[t]he government represented that the work would last through March of 2009." (*Id*.)

According to Respondents, their hiring of temporary laborers occurred as part of their fulfillment of the Government's "urgent" and "unforeseen" Task Order 0002. (Dkt. No. 8.) Also according to Respondents, on September 29, 2008, thirty (30) of the seventy-two (72) individuals who filed complainants were terminated by Respondents for performance issues at the express direction of the United States Government, following a surprise inspection of the night shift by government contracting representatives, and a brigadier general from the Army. (Dkt. No. 8; Dkt. No. 9, at ¶ 20.)[2]  In "the middle of October," Mr. Booker learned "that the government was removing 51 vehicles away from Respondents' performance, and that

---

[2] Respondents make this assertion in their Memorandum of Law. (Dkt. No. 8, at 9-10.) However, the affidavit of Mr. Booker simply states that approximately thirty workers were terminated after the Government's unannounced visit on September 29, 2008. (Dkt. No. 9, at ¶ 20.) Similarly, in a separate affidavit submitted by Respondents, Richard Ross, Operations Manager for Respondents, states that, on September 29, 2008, approximately thirty workers (most of whom were among the 72 complainants in this action) were terminated after a site visit by the Government. (Dkt. No. 10, at ¶ 5.) Mindful of the discrepancy between these two affidavits and Respondents' Memorandum of Law, the Court finds that the affidavits' implication of a casual effect is sufficient to satisfy Respondents' burden.

Respondents would not be used by the government to perform armoring work on the subsequent waves of vehicles requiring 'up armoring.'" (Dkt. No. 9, at ¶ 21.)

On December 19, 2008, Scott D. Chaplin, Senior Vice President and General Counsel of Stanley, sent the New York State Attorney General's Office a letter regarding Respondents' work at Fort Drum. (Dkt. No. 1, Part 18, at 4.) Among other things, the letter stated that "[t]here is no written contract document that specifically identifies the project at issue." (*Id*.) "At the direction of the U.S. Army, Contracting Officer's Representative, the [Fort Drum] work was performed using funds obligated to contract line item number 1002AE, Heavy Add On Armor Installation, on Task Order 0002 issued under Stanley Associates' prime contract . . . ." (*Id*.)[3]

Furthermore, the letter stated that the Government had work performance requirements associated with the task. (*Id*.) According to Respondents, "[t]he Task Order Performance Work Statement . . . establishes that the scope of [Respondents'] work under the task order was subject to the discretion and oversight of the U.S. Army Field Logistics Readiness Division Contracting Officer Representative." (Dkt. No. 8.) Moreover, according to Respondents, "[a]ll information regarding the nature and scope of the 'Up Armor' tasking was provided to [Respondents'] by government personnel or their contracting representatives." (Dkt. No. 9, at ¶¶ 6-15.) Finally, according to Respondents, "[t]he initial mobilization order was given and the work was performed under the direction and supervision of government personnel." (*Id*. at ¶¶ 5-8.)

---

[3] The letter also stated that Stanley's prime contract "is a multiple award, indefinite delivery, indefinite contract with a five year ordering period commencing 6 February 2007[,] . . . supporting U.S. Army field and installation readiness." (Dkt. No. 1, Part 18, at 4.) Similarly, the letter stated that Respondents' *subcontract* "is a multiple award, indefinite delivery, indefinite contract with a five year ordering period commencing 6 February 2007." (*Id*.)

**II.     APPLICABLE LAW**

"Ordinarily, the well-pleaded complaint rule dictates that a defendant may remove an action from state court to federal court only if the case could have been filed in federal court in the first instance." *Miranda v. Abex Corp.*, 08-CV-5509, 2008 WL 4778886, at *1 (S.D.N.Y. Oct. 31, 2008) (citing *City of Rome v. Verizon Commc'ns, Inc.*, 362 F.3d 168, 174 [2d Cir. 2004]). "Thus federal question jurisdiction may be invoked only when a federal question is presented on the face of the plaintiffs' properly pleaded complaint." *Abex Corp.*, 2008 WL 4778886, at *1 (citations omitted). "Suits against federal officers are an exception to this general rule." *Id.* (citing *Jefferson County v. Acker*, 527 U.S. 423, 431 [1999]). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Id.* (citation omitted).

"The federal officer removal statute provides that '[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office' may remove [the action] to federal court." *Id.* (citing 28 U.S.C. § 1442[a][1]). "If the defendant moving for removal is not a federal officer or agency, three conditions must be satisfied for removal to be appropriate." *Id.* "First, the defendant must show that it is a 'person' as that term is used in section 1442(a)(1). *Id.* (citing *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 124 [2d Cir. 2007]). "Second, the defendant must offer a colorable federal defense." *Id.* (citations omitted). "Third, it must establish that it was 'acting under' a federal officer, which subsumes the existence of a 'causal connection' between the charged conduct and asserted official authority." *Id.* (citations omitted).

"While other removal statutes are interpreted narrowly, the federal officer removal statute 'must be liberally construed.'" *Id*. (citing *Isaacson v. Dow Chemical Co*., 517 F.3d 129, 136 (2d Cir. 2008) (other citations omitted). However, "[t]he burden is on defendants to establish the elements of federal officer jurisdiction." *Hilbert v. Aeroquip, Inc*., 486 F. Supp.2d 135, 143 (D. Mass. 2007) (citing *Ryan v. Dow Chem. Co*., 781 F. Supp. 934, 939 [E.D.N.Y. 1992]) (other citation omitted).

### III. DISCUSSION

Petitioner concedes that Respondents satisfied the first two prongs set forth in Part II of this Decision and Order. (Dkt. No. 6, Part 3, at 6-7.) Therefore, the Court need consider only whether Respondents were "acting under" a federal officer–i.e., whether there is a "causal connection" between the charged fraudulent conduct and asserted official authority.

Respondents argue that they were acting under a federal officer because the Government (1) hired them to perform a job, (2) indicated that the potential scope of the job could be expanded beyond the October 14, 2008, deadline to complete the job, (3) informed them of the number of workers necessary to complete the job, (4) oversaw the workers' work at Fort Drum, and (5) ordered Respondents to terminate thirty of the workers shortly after they began working.

Petitioner argues that, while all of Respondents' assertions about the Government's involvement may be true, the Government was not involved in the hiring process, and did not direct Respondents to solicit workers in a fraudulent manner. In support of its argument, Petitioner states that "[n]o evidence has been presented which ties the [fraudulent solicitation and recruitment of workers] to government direction or control." (Dkt. No. 11.)

In *Depascale v. Sylvania Elec. Prod., Inc*., the Eastern District of New York noted that "[the 'acting under'] prong of the jurisdictional test is satisfied by showing that the acts forming the basis of plaintiff's claim occurred because of what was being performed for the government."

8

*Depascale v. Sylvania Elec. Prod., Inc.*, 584 F. Supp.2d 522, 526 (E.D.N.Y. 2008) (citing *Isaacson*, 517 F.3d at 137-38). In other words, "[t]ranslated to non-governmental corporate defendants, such entities must demonstrate that the acts for which they are being sued–here, [the fraudulent and deceptive hiring of individuals]–occurred because of what they were asked to do by the Government." *Isaacson*, 517 F.3d at 137.

When considering this prong, it is important to keep in mind that "[t]he hurdle erected by this requirement is quite low . . ." *Depascale*, 584 F. Supp.2d at 526 (citing *Isaacson*, 517 F.3d at 137). The Court must "credit [Respondents'] theory of the case when determining whether a causal connection exists." *Isaacson*, 517 F.3d at 137 (citing *Jefferson County*, 527 U.S. at 432). Furthermore, "[t]o show causation, [Respondents] must only establish that the act that is the subject of [Petitioner's] attack [for example, Respondents' alleged fraudulent solicitation of certain employees]. . . occurred while [Respondents] w[ere] performing [their] official duties." *Isaacson*, 517 F.3d at 137-38.

Here, as did the respondents in *Isaacson*, Respondents have made the required showing that the alleged fraudulent solicitation of certain employees occurred while Respondents were performing their official duties. According to Respondents, the Government (through Henry Meadows) informed Mr. Booker (Respondents' representative) that "the work was to consist of four waves of 'up armoring' vehicles, with the first wave to constitute 151-167 vehicles, to be followed by successive waves of vehicles requiring pre-deployment up armoring." In addition,"[t]he government represented that the work would last through March of 2009." Based on these statements, a fair interpretation of Mr. Booker's affidavit is that his representations to applicants that the job could last through March 2009 occurred because the Government asked Respondents to be prepared to handle four waves of "up armoring" that would not conclude until March 2009. Stated another way, assuming the accuracy of Mr. Booker's affidavit, the

statements made by Henry Meadows that there would be "four waves" of "up armoring," which would not conclude until March 2009, gave rise to the alleged fraudulent promises. For all of these reasons, whether the fraudulent promises were "specifically directed by the federal Government, is . . . for the federal–not state–courts to answer." *Isaacson*, 517 F.3d at 138.

Furthermore, it is important to note that Respondents have also adduced evidence that (1) the Government indicated that it was in charge of the operation, (2) approximately thirty workers were terminated at the Government's request, and (3) the Government decided in "the middle of October . . . that [Respondents] would not be used . . . to perform armoring work on the subsequent waves of vehicles requiring 'up armoring.'" Collectively, such testimony constitutes additional evidence of control over the operation. *See Stanley v. Wyeth Inc*., 06-CV-1979, 2006 WL 2588147, at *2 (E.D. La. Sept. 8, 2006) (noting that "[c]ases . . . where private defendants were held to meet the § 1442(a)(1) standard of occupying 'essentially the position of employees of the government' were those in which the government contracted with a private company for a service or product and then exercised control over the defendant's performance.").

In sum, the Court finds that, according to Mr. Booker's affidavit, Respondents' representations that the job could last through March 2009 occurred because the Government asked Respondents to be prepared to handle four waves of "up armoring" that would not conclude until March 2009. Therefore, the Court concludes that there is a "causal connection" between the charged fraudulent conduct and asserted official authority. Based on this conclusion, the Court need not, and does not, address whether this action was properly removed pursuant to 28 U.S.C. § 1441.

**ACCORDINGLY**, it is

**ORDERED** that Petitioner's motion to remand the proceedings back to state court (Dkt. No. 6) is **DENIED**; and it is further

**ORDERED** that the parties reschedule an expedited Rule 16 conference to be held with Magistrate Judge DiBianco within **THIRTY (30) DAYS** of the date of this Decision and Order. The civil case management plan shall be filed ten (10) days prior to the Rule 16 conference.

Dated: September 1, 2009
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge